**F I L E D**

PUBLISH

**March 28, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

TRAVIS DENNY,

    Defendant-Appellee.

No. 05-2014

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-04-666-JP)**

---

Norman Cairns, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellant.

Joe M. Romero, Jr., Albuquerque, New Mexico, for Defendant-Appellee.

---

Before **LUCERO**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

    A grand jury indicted Defendant Travis Denny on possession with intent to distribute 500 grams or more of a substance containing cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Defendant filed a motion to suppress the cocaine which a

federal agent seized from his Amtrak train economy sleeper. The district court granted

Defendant's motion and the Government appeals. We exercise jurisdiction under 18

U.S.C. § 3731. We review the district court's underlying factual findings for clear error

and its conclusion that the cocaine's seizure was unreasonable de novo. See United

States v. Sims, 428 F.3d 945, 951 (10th Cir. 2005). For reasons which follow, we

reverse.

## I.

The relevant historical facts are taken from the transcript of the suppression

hearing. That transcript contains the testimony of three Drug Enforcement

Administration (DEA) agents – Ron Deist, Mark Hyland, and William Dorian. Agent

Hyland explained DEA agents assigned to the Amtrak interdiction unit routinely review

Amtrak reservation information of passengers passing through Albuquerque. The agents

are looking for passengers whose travel arrangements are consistent with someone

smuggling drugs or other contraband. On March 17, 2004, Defendant was a passenger

aboard an Amtrak train arriving in Albuquerque from Los Angeles. Prior to their

encounter with Defendant, agents checked his reservation information. Their check

revealed that on the day prior to the train's departure, Defendant purchased a one-way

ticket from Los Angeles to Newark, New Jersey.[1] Agents also ran a criminal history

_____

[1] Agent Hyland estimated DEA agents in Albuquerque make 80 to 100 drug
interdictions on Amtrak per year. He explained the significance of Defendant's one-way
(continued...)

check on Defendant and found prior drug-related convictions. According to the NCIC report, Defendant had been released from the New Jersey prison system in 1998. Based on the foregoing information, agents believed Defendant might be a drug courier and decided to contact him.

Agents Dorian and Deist, both in plain clothes, first encountered Defendant in the common luggage area of the train during its stop in Albuquerque. Agent Dorian identified himself as a DEA agent, showed his badge, and asked Defendant if he could speak with him. Defendant "said yes." Agent Dorian checked Defendant's ticket. Defendant told the agents he had flown to Los Angeles. Agent Dorian asked Defendant

---

[1](...continued)
ticket:

> In interdiction narcotics work, we see a lot of one-way travel where people – couriers will leave from their home city to go get narcotics on the West Coast or southwest border, and then they can't fly back because of the increased security at the airport, so they're scared that their baggage will be searched or their person will be searched at the airport, and they will then either take the train or a bus which has a less – lower level of security level, or they will rent a vehicle, and they will drive back to their home with the narcotics. And we've made several cases over the years where we see one-way purchases.

Agent Hyland further explained the significance of the timing of Defendant's purchase:

> Due to my training, experience, narcotic couriers commonly – they don't have control of their time. They have to – they may be waiting for the narcotics to arrive at their city of origin, and they don't know how they're going to get back, and they make reservations at the last minute, they purchase tickets at the last minute.

whether he was carrying any luggage. Defendant responded he had two bags, one in the common luggage area and another "upstairs" in his sleeper. Agent Dorian asked Defendant for permission to search both bags. Defendant "said yes." Agent Deist searched the bag in the common luggage area. Defendant led Agent Dorian upstairs to the sleeper. Agents Hyland and Deist did not accompany them. Defendant entered his sleeper. At all times during the encounter, the sleeper's door remained open. From where Agent Dorian stood at the sleeper's threshold, he observed a gym bag on the right seat.[2] The agent watched while Defendant partially unzipped the bag and removed a pair of shoes. Defendant told the agent "I don't have anything else in the bag," put the shoes back in the bag, and zipped it closed. When Defendant removed the pair of shoes, however, Agent Dorian observed other items inside the bag. Agent Dorian again asked Defendant if he (Agent Dorian) could search the gym bag. Defendant refused stating "you just did."

Concluding Defendant had withdrawn his consent to search the gym bag,

---

[2] An economy sleeper, formally known as a roomette, is designed for one or two passengers. The sleeper has reclining seats on either side of a picture window. The seats convert to a lower bed. The upper bed folds down from above. An economy sleeper measures either 3'6" x 6'6" or 3'6" x 6'8", depending on whether part of a Superliner or Viewliner train. A detailed description of Amtrak's Superliner Roomette may be found at http://www.amtrak.com/servlet/ContentServer?cid=1080080553972&pagename=Amtrak%2Fam2Copy%2FAccommodations_Page&c=am2Copy. Amtrak's Viewliner Roomette description may be viewed at http://www.amtrak.com/servlet/ContentServer?cid=1080080553861&pagename=Amtrak%2Fam2Copy%2FAccommodations_Page&c=am2Copy.

4

Agent Dorian asked Defendant if he would allow a narcotics dog to sniff the bag. Defendant "said yes." Agent Dorian stepped back from the sleeper's entrance and into the hallway to summon a K-9 unit. At that point, Defendant became visibly agitated and upset. Defendant asked Agent Dorian if he could step outside to smoke a cigarette. Agent Dorian told Defendant he was not being detained. Defendant instead paced "back and forth" in the hallway. Defendant asked Agent Dorian when the narcotics dog would arrive and what it would do. Agent Dorian explained to Defendant the narcotics dog would arrive momentarily and would sniff the bag and "alert" if the bag contained narcotics.

Defendant reentered the sleeper, while its door remained open. Standing just outside the sleeper, Agent Dorian heard Defendant unzip the gym bag. The agent watched, apparently without Defendant's knowledge, while Defendant removed from his gym bag a clear plastic bag containing a "Ritz" cracker box: "I saw him [Defendant] kneel down and take a plastic bag out of that bag, that gym bag, and place it under the [left] seat . . . ." After he had placed the plastic bag underneath the seat, Defendant informed Agent Dorian "[y]ou can go ahead and search the [gym] bag now." Agent Dorian reentered the sleeper to search the gym bag.

Before searching the gym bag, Agent Dorian asked Defendant if any other bags, of any type, in the sleeper belonged to him. Defendant "said no." Agent Dorian proceeded to search the gym bag but found nothing incriminating. Defendant stated "I told you,

5

there is nothing in here. See, I told you." Agent Dorian asked Defendant about the plastic bag underneath the seat. When the agent asked whether the bag belonged to Defendant, Defendant responded "no, he didn't know anything about that bag." At that point, Agent Dorian considered the plastic bag abandoned.

Agent Dorian asked Defendant for permission to conduct a protective patdown. Defendant consented. As Agent Dorian conducted the patdown, he traversed from the small space inside the sleeper back into the hallway: "I was standing just in front of the room. And he was, I believe, one of his legs, possible his left side, was inside the room. And he was kind of leaning against the side of the entrance to the door or to the room."[3] Following the patdown, Agent Dorian again reentered Defendant's sleeper and picked up the plastic bag. Agent Dorian reached inside the plastic bag and opened the flaps of the cracker box which were closed but not sealed. Inside the cracker box Agent Dorian observed a duct-taped bundle consistent with a "brick" of cocaine. To make a long story shorter, Agent Dorian arrested Defendant after a brief struggle.

---

[3] Agent Dorian explained the necessity of stepping back into the hallway to conduct the patdown:

Q. And this is a crowded compartment, is it not? Is it fair to say it's a crowded compartment?
A. It's small; for one person generally.
&ast; &ast; &ast;
Q. And it's even more crowded if two people are in there?
A. Yes.

Based upon factual findings consistent with the foregoing, the district court issued a thorough written order suppressing the cocaine. The court identified the controlling questions as "whether Agent Dorian [once he stepped back into the hallway to conduct the patdown] lawfully reentered the sleeper room to retrieve the plastic bag with the cracker box from under the seat . . . and [if so,] whether Agent Dorian exceeded the scope of permissible action by searching the [cracker box] without a warrant or probable cause." The district court concluded Agent Dorian, once he witnessed Defendant remove the plastic bag from his gym bag and place it underneath the seat, had reasonable suspicion to believe the plastic bag contained contraband: "All of the[] circumstances including the agent's collective training and experience were sufficient for Agent Dorian to have developed a reasonable articulable suspicion that the plastic bag with the cracker box contained evidence of criminal activity." The court reasoned Agent Dorian could have seized the bag based upon such suspicion while lawfully inside Defendant's sleeper conducting the consensual search of Defendant's gym bag. But because the purpose for which Defendant consented to Agent Dorian's presence in the sleeper had been satisfied ( i.e., the search of the gym bag), the district court reasoned Agent Dorian, absent Defendant's renewed consent, could not lawfully reenter Defendant's sleeper once the agent stepped into the hallway to conduct the protective patdown. The court held that because Defendant had "some" reasonable expectation of privacy in his sleeper, Agent Dorian's reentry into the sleeper violated Defendant's Fourth Amendment rights.

7

The district court further concluded that even if the plastic bag's seizure was justified, Agent Dorian prematurely and unlawfully searched the cracker box within the bag without a warrant. The district court rejected the Government's argument Defendant abandoned the plastic bag when he explicitly disavowed any ownership interest in it. Because, according to the court, "Defendant's actions with respect to the plastic bag [were] contrary to his disclaimer of ownership[,]" the Government failed to meet "its burden of showing clearly that the Defendant failed to retain any reasonable expectation of privacy in the plastic bag."

II.

On appeal, the Government first argues the district court erred in holding Agent Dorian violated the Fourth Amendment when he reentered Defendant's sleeper to seize the plastic bag containing the cracker box. According to the district court, the seizure was unreasonable because Agent Dorian invaded Defendant's reasonable expectation of privacy in his sleeper to effectuate the seizure. In determining the reasonableness of Agent Dorian's actions, we first assess the degree to which his actions intruded upon Defendant's reasonable expectation of privacy and the degree to which such actions were necessary to promote legitimate governmental interests. See Wyoming v. Houghton, 526 U.S. 295, 299-300 (1999). A balancing of those expectations and interests then guides our determination of reasonableness under the Fourth Amendment. See Whren v. United States, 517 U.S. 806, 817 (1996) (explaining that while not always apparent, every Fourth

8

Amendment case in principle involves a balancing of all relevant factors).

We have previously acknowledged passengers traveling in train sleepers enjoy a greater expectation of privacy than passengers traveling in coach. But we have not defined the precise degree of privacy a train sleeper confers on its occupant. We have stated only that "such roomettes do not confer upon occupants the same degree of privacy as a dwelling or hotel or motel room[.]" See United States v. Little, 18 F.3d 1499, 1505 (10th Cir. 1994) (en banc).[4] As Judge McConnell has noted, a train is a "social space[] where citizens routinely encounter strangers. Even within a semi-private train roomette, a passenger likely will confront the ticket collector, the snack vendor, and perhaps other passengers milling about the train." United States v. Abdenbi, 361 F.3d 1282, 1302 (10th Cir. 2004) (McConnell, J., dissenting).

Sound reasons exist why federal courts have hesitated to recognize any substantial degree of privacy interest in a train sleeper. In United States v. Whitehead, 849 F.2d 849, 854 (4th Cir. 1988) (superceded in part by statute on other grounds), the Fourth Circuit explained the "diminished privacy aspects" of a train sleeper "result in part from the law enforcement exigency created by ready mobility and its potential for immediate flight from the jurisdiction, as well as from the web of governmental regulation that surrounds

---

[4] In United States v. Colyer, 878 F.2d 469, 475 (D.C. Cir. 1989), the D. C. Circuit aptly noted that "[a] sleeper car does indeed possess several indicia of a dwelling; but then again, so does a motor home, which, the Supreme Court has held, falls within the ambit of the automobile exception to the Warrant Clause." (citing California v. Carney, 471 U.S. 386, 392 (1985)).

9

most forms of [public] transportation." (internal citation omitted). The court noted in that case defendant "was required on at least three or four occasions to open his compartment for routine ticket checks." Id. at 855. It further recognized "the riding public and train employees alike enjoyed ready access to [defendant's] tiny compartment if he stepped out or did not engage the inside sliding lock." Id. For all these reasons, the court concluded one's privacy interests in a train sleeper were "*substantially less* than those attached to fixed dwellings." Id. at 854 (emphasis added).

In United States v. Liberto, 660 F. Supp. 889, 891 (D.D.C. 1987), aff'd without opinion, 838 F.2d 571 (D.C. Cir. 1988), the court similarly explained the reduced expectation of privacy in a train sleeper while focusing on the particular facts of that case:

> The travel of passengers by railroad has always been subject to pervasive government regulation. Moreover, passengers in sleeper compartments are subject to inquiry and oversight by the conductors and other railroad employees. And in this case, the defendant's own behavior, in leaving the compartment door open and the curtains parted, suggested that he was not relying on any increased expectation of privacy afforded by a separate compartment.

(internal citation omitted). Notably, in United States v. Tartaglia, 864 F.2d 837, 841 (D.C. Cir. 1989), the D.C. Circuit reaffirmed Liberto, relying on it to summarily reject a defendant's claim that he possessed a "heightened expectation of privacy in his train roomette."

In addition to the foregoing reasons, the facts of this case further illustrate why Defendant possessed a diminished expectation of privacy in his train sleeper. Defendant

10

twice consented to Agent Dorian's entry into his sleeper just prior to the patdown. Defendant then consented to the patdown itself while Agent Dorian was still inside the sleeper. Throughout the entire encounter, the door to Defendant's sleeper remained open exposing both its contents and Defendant's suspect actions to Agent Dorian. The obvious reason Agent Dorian stepped outside the small confines of the sleeper before seizing the plastic bag was so he could safely patdown Defendant in preparation for the seizure.

On the opposite scale, the Government's interest in enforcing our nation's drug laws is undoubtedly substantial for reasons too numerous to detail here. Suffice it to say "[t]he public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit." United States v. Mendenhall, 446 U.S. 544, 561 (1980) (Powell, J., concurring in part). At the same time, the Government has a keen interest in ensuring the safety of its officers and agents assigned to fight our Nation's drug scourge. The public's interest in the safety of its law enforcement officials "is both legitimate and weighty." Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977).

Balancing the respective interests, we conclude the district court in this case erroneously held Defendant's privacy interests required Agent Dorian to obtain Defendant's express consent before reentering the sleeper following the protective patdown. Whatever the measure of Defendant's "diminished" expectation of privacy in his sleeper, we are certain, based upon both the foregoing authorities and the specific facts of this case, that Agent Dorian did not unreasonably infringe upon that expectation

11

by momentarily reentering the sleeper to seize the plastic bag and the cracker box it contained from underneath the seat This was not a fishing expedition. The district court concluded, correctly we add, that Agent Dorian had reasonable suspicion to seize the bag while inside the sleeper.[5] See United States v. Houston, 21 F.3d 1035, 1036-38 (10th Cir. 1994) (holding reasonable suspicion supported an agent's seizure of defendant's suitcase from within his train sleeper). We can discern no good reason why the law should not permit Agent Dorian to step outside the close confines of Defendant's sleeper to conduct a brief patdown for the safety of both himself and Defendant before reentering the sleeper to seize the plastic bag. Agent Dorian's subsequent reentry was limited both in scope and time and the intrusion into Defendant's privacy at that point was minimal. No measurable harm to Defendant's privacy interests resulted from Agent Dorian recrossing the threshold of the sleeper. Considering the totality of the circumstances, we easily conclude Agent Dorian's brief reentry into Defendant's sleeper for the sole purpose of seizing the plastic bag and the cracker box within it was imminently reasonable.

## III.

Having determined Agent Dorian's reentry into Defendant's sleeper did not violate the Fourth Amendment, we next turn to the agent's search of the cracker box. The

---

[5] Defendant challenges neither the district court's conclusion that the surrounding circumstances gave rise to reasonable suspicion the plastic bag contained evidence of criminal activity, nor the court's conclusion that prior to the patdown Defendant consented to Agent Dorian's presence in the sleeper.

12

Government argues Defendant has no standing to challenge the search because Defendant abandoned the plastic bag and its contents when he explicitly disavowed any ownership interest in them. See United States v. Garzon, 119 F.3d 1446, 1449 (10th Cir. 1997) ("Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search . . . of property which has been abandoned."). The district court reasoned that because Defendant placed the plastic bag underneath the seat inside his sleeper, he evidenced an intent to keep the bag from public scrutiny. Moreover, according to the court, because Defendant's conduct was contrary to his disclaimer of ownership, the Government did not establish Defendant relinquished his expectation of privacy in the contents of the plastic bag. See United States v. Pitts, 322 F.3d 449, 456 (7th Cir. 2003) (recognizing the burden is on the Government to establish abandonment by a preponderance of the evidence).

By removing the plastic bag from his gym bag and placing the former underneath the seat, Defendant obviously was attempting to hide it from Agent Dorian–much the same way a suspect running from police seeks to hide his contraband by throwing it in the bushes. Like the fleeing suspect, Defendant did not subjectively intend to expose his contraband to the public. Rather, Defendant undoubtedly intended to retrieve the bag once the agent was no longer on his trail. The district court essentially so found and we have no quarrel with that. But the fact Defendant intended to hide the bag and retrieve it from underneath the seat at a later time does not dispose of our inquiry. We still must ask

13

whether Defendant maintained an objectively reasonable expectation of privacy in the bag

and the cracker box within it when, in response to Agent Dorian's inquiries, he expressly

disclaimed ownership of the bag and its contents.  See United States v. Austin, 66 F.3d

1115, 1118 (10th Cir. 1995).  In Garzon, 119 F.3d at 1449 (internal citations omitted), we

explained:

> This test for abandonment subsumes both a subjective and an objective component.  Findings of subjective intent are findings of fact which we review only under a clearly erroneous standard.  However, a determination of whether the defendant retained an objectively reasonable expectation of privacy in the property that society will recognize is a question of law that we review *de novo*.

Whether Defendant harbored a desire to later retrieve the bag is irrelevant to our

analysis of the objective component.  See Austin, 66 F.3d at 1118.  Even where a suspect

does not subjectively intend to relinquish all ownership interest in an item, such suspect

may nevertheless relinquish his or her reasonable expectation of privacy in the item.  See

United States v. Basinski, 226 F.3d 829, 836 (7th Cir. 2000) (explaining the objective

prong of the abandonment inquiry requires the court to "look solely to the external

manifestations of [defendant's] intent").  Subjective intent aside, "one who disclaims

ownership is likely to be found to have abandoned ownership.  Phrased another way,

disclaiming ownership is tantamount to declaring indifference, and thus negates the

existence of any privacy concern in a container's contents."  United States v. Zapata, 18

F.3d 971, 978 (1st Cir. 1994) (internal citations omitted); accord United States v. Frazier,

936 F.2d 262, 265 (6th Cir. 1991) (holding verbal disclaimer of ownership constituted

abandonment of bag); <u>United States v. Lewis</u>, 921 F.2d 1294, 1302 (D.C. Cir. 1990)

(explaining "voluntary denial of ownership demonstrates sufficient intent of

disassociation to prove abandonment"); <u>Bond v. United States</u>, 77 F.3d 1009, 1013 (7th

Cir. 1996) (same).  Indeed, Defendant does not cite and we have not found a case in

which a defendant's express disclaimer of ownership in response to a lawful police

inquiry did not constitute abandonment of property in the Fourth Amendment context.[6]

Our decision in <u>United States v. Burbage</u>, 365 F.3d 1174 (10th Cir. 2004) is

consistent with the foregoing authority.  In <u>Burbage</u>, a DEA agent aboard an Amtrak train

asked defendant whether a backpack in an overhead rack belonged to him.  Defendant

answered no, but "added the owner of the backpack had given him permission to put his

green portfolio inside it."  <u>Id.</u> at 1176.  On appeal, defendant argued he "asserted

sufficient interest in the backpack to preclude treatment of it as an abandoned object."  <u>Id.</u>

at 1178 (internal quotations omitted).  We rejected that argument and explained:

> By affirmatively denying to [the agent] that he owned the backpack,
> Defendant lost any objectively reasonable expectation of privacy in the
> backpack as a whole.  *To deny ownership is to announce to the world, "you
> want it, you can have it, as far as I'm concerned."*  Having made that

_____

[6] In <u>Garzon</u>, 119 F.3d at 1452, we observed:  "Every case in which we have found abandonment involved a situation where the defendant *either* (1) explicitly disclaimed an interest in the object, *or* (2) unambiguously engaged in physical conduct that constituted abandonment." (emphasis added).  In <u>Garzon</u>, we held defendant had not abandoned his bags by leaving them on a bus consistent with bus rules, despite a police officer's order to remove all bags in preparation for a dog sniff.  We "emphasize[d] that Garzon did nothing to manifest objectively an intent to abandon his backpacks that were left on the bus.  Garzon never once denied ownership of those backpacks." <u>Id.</u> at 1450.

announcement, Defendant could not reasonably expect [the agent] to recognize that he had a privacy interest in the backpack.

Id. at 1178-79 (emphasis added).

Similarly, when Defendant affirmatively denied owning the plastic bag he too voluntarily relinquished any *reasonable* expectation of privacy in its contents.[7] Agent Dorian entered the sleeper (*i.e.*, the consensual entry prior to the patdown) after watching Defendant remove the plastic bag from the gym bag and place the former underneath the seat. Defendant obviously was trying to disassociate himself from the bag and its contents, albeit for the time being. Agent Dorian specifically asked Defendant whether any other bags inside the sleeper, aside from the gym bag, belonged to Defendant. Agent Dorian made his inquiry as broad as possible by asking about bags "of any type." Defendant responded no. Agent Dorian then specifically asked Defendant if the plastic bag underneath the seat belonged to him. Defendant again responded no, and added he did not know anything about the plastic bag. Defendant's verbal disavowment of any knowledge about the plastic bag or its contents was unequivocal. Agent Dorian was entitled to take Defendant at his word.

That Agent Dorian might have known Defendant previously exercised dominion

---

[7] That Defendant was the subject of Agent Dorian's investigation and may have feared incriminating himself has no bearing upon our conclusion. See United States v. Flynn, 309 F.3d 736, 738 (10th Cir. 2002) (explaining a lawful police investigation at the time of abandonment does not render the abandonment involuntary); United States v. Han, 74 F.3d 537, 544 (4th Cir. 1996) (explaining a defendant's fear of incrimination does not render disclaimer of ownership ineffective).

16

over the bag is irrelevant.  "The constitutional property right belonged to [Defendant], and his abandonment of that right did not depend on whether [Agent Dorian] knew that it existed."  United States v. Han, 74 F.3d 537, 543 (4th Cir. 1996); see also United States v. Torres, 949 F.2d 606, 608 (2d Cir. 1991) (noting "an otherwise legitimate privacy interest may be lost by disclaiming or abandoning property, especially when actions *or* statements disavow any expectation of privacy") (emphasis added); United States v. Ruiz, 935 F.2d 982, 984 (8th Cir. 1991) (rejecting argument that a disclaimer did not constitute abandonment because the detective knew defendant was lying when he denied ownership).  When Agent Dorian inquired about the plastic bag, Defendant did not exhibit any normal precaution consistent with ownership which might lead us to conclude he had a reasonable expectation of privacy in the bag.  Defendant was not seeking to protect the bag from Agent Dorian at that point; rather, Defendant was disassociating himself from the bag best he knew how–by disclaiming ownership of and denying any knowledge about the bag, in other words, by abandoning it.  Compare Smith v. Ohio, 494 U.S. 541, 543 (1990) (rejecting the argument that an individual abandoned his grocery bag where he attempted to protect it from inspection after throwing it on his car to respond to a police officer's inquiry).

Defendant makes much of the fact the plastic bag was inside his sleeper.  Given that Agent Dorian was lawfully inside the sleeper when he seized the bag, we cannot agree with  the proposition that the plastic bag's presence inside the sleeper in itself

17

somehow negated Defendant's unequivocal disclaimer of ownership. That Defendant had rented a sleeper and placed personal effects therein does not establish a reasonable expectation of privacy in the entirety of its contents when Defendant explicitly disclaimed ownership in a portion of those contents, specifically the plastic bag. See Burbage, 365 F.3d 1178-79; United States v. Sweeting, 933 F.2d 962, 964 (11th Cir. 1991). Perhaps the location of the bag inside the sleeper would be relevant if the Government sought to establish abandonment through Defendant's actions, rather than his words. See United States v. Donnes, 947 F.2d 1430, 1436 n.8 (10th Cir. 1991) (rejecting government's argument defendant abandoned property by leaving it in his girlfriend's house because defendant had a legitimate expectation of privacy in the house). In such a case, where a defendant places his property is relevant to the determination of whether society would recognize his or her expectation of privacy in the property as reasonable. See e.g. United States v. Flynn, 309 F.3d 736, 738 (10th Cir. 2002) (holding society will not recognize a reasonable expectation of privacy in property a defendant voluntarily leaves behind in the street). But, given Defendant's diminished expectation of privacy in his sleeper, the actual location of the bag inside the sleeper is of little relevance because Agent Dorian made an objectively reasonable determination that Defendant intended to abandon the bag based on Defendant's own unequivocal statements. See United States v. Williams, 538 F.2d 549, 550-51 (4th Cir. 1976) (defendant's express disclaimer of ownership interest in typewriter and briefcase inside his motel room constituted abandonment). We conclude

18

the district court erred to the extent it concluded Defendant, once he expressly disclaimed any ownership interest in the plastic bag and its contents, maintained an expectation of privacy therein which society would accept as reasonable.  Because Defendant abandoned the plastic bag and its contents, he had no standing to objection to Agent Dorian's search of the cracker box.

REVERSED.