FILED
United States Court of Appeals
Tenth Circuit

September 2, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

PETER ANTONIO TUBENS,

      Defendant-Appellant.

No. 13-4118

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:11-CR-00579-TC-1)**

Submitted on the briefs:

Robert M. Gamburg, Philadelphia, Pennsylvania, for Defendant-Appellant.

Jonathan Hornok, Law Student (Diana Hagen, Assistant United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

Before **HARTZ, EBEL,** and **GORSUCH,** Circuit Judges.

**EBEL**, Circuit Judge.

After methamphetamine was recovered from his carry-on luggage aboard a Greyhound bus, Defendant-Appellant Peter Tubens was charged with possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Tubens pled not guilty and filed a motion to suppress the evidence against him, asserting that it had been obtained in violation of the Fourth Amendment. Following an evidentiary hearing and full briefing by both parties, the district court issued a written decision denying the motion. Tubens proceeded to trial, where he was found guilty by a jury of his peers, and subsequently sentenced to 240 months' imprisonment to be followed by sixty months' supervised release. Tubens now appeals, reasserting his claim that the evidence was obtained in violation of the Fourth Amendment. Exercising jurisdiction under 28 U.S.C. § 1291, we now AFFIRM.[1]

## I.    BACKGROUND

On the morning of June 7, 2011, Utah Highway Patrol Sergeant Steve Salas and Emery County Sherriff Deputy Blake Gardner were conducting drug interdiction activities along Interstate 70 in Green River, Utah. The officers were accompanied by their Belgian Malinois, Duke and Niko, both of whom are state-certified narcotics dogs trained to detect the odor of marijuana, cocaine, heroin, and methamphetamine. In line

---

[1] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G). This case is therefore ordered submitted without oral argument.

with their usual interdiction routine, the officers followed a Greyhound bus into the West Winds Truck Stop, where the bus was scheduled to stop for a twenty-minute passenger break. While the officers were pulling into the truck stop, a second Greyhound bus also arrived for its scheduled passenger break. After obtaining consent from the respective bus drivers, Sergeant Salas deployed Duke into the luggage compartment of the first bus while Deputy Gardner did the same with Niko in the second bus.

When Duke did not alert to anything in the first bus, Sergeant Salas began to lead Duke back to his patrol car. Deputy Gardner headed them off, however, and asked Sergeant Salas to deploy Duke into the luggage compartment of the second bus, which Niko had just finished searching. Deputy Gardner did not point Duke or Sergeant Salas to any particular area of the second bus. Duke was deployed and almost immediately alerted to a black canvas suitcase: although "he never gave a final response by scratching," "he wouldn't leave the bag for four to five seconds, closed mouth, intense sniffing," Vol. 2 at 27. Sergeant Salas would later testify that it was a "strong alert," which was telling him that there was "narcotic odor . . . inside that bag." Id. at 48. He informed Deputy Gardner of Duke's alert, and Deputy Gardner relayed that Niko had alerted to the same suitcase. The officers removed the suitcase and, after locating its Greyhound identification tag, determined that it belonged to Defendant Peter Tubens, who had a final destination of Philadelphia.

Once all of the passengers had reboarded the bus, Sergeant Salas, who was in uniform, boarded the bus, stood by the driver's seat, and said "in a sufficiently loud but

3

non-threatening voice," Vol. 1 at 57, "I'm looking for Mr. Tubens. Is there a Mr. Tubens in the bus? I'm looking for Mr. Tubens. Any passenger with the name of Mr. Tubens, please come forward." Vol. 2 at 33. The passengers on the bus were "very quiet" when Sergeant Salas spoke and, according to the district court, "anyone on the bus who did not have a hearing disability would have heard Sergeant Salas's request." Vol. 1 at 57. Yet, no one responded, so Sergeant Salas asked Deputy Gardener to board the bus to help him locate Tubens. Once Deputy Gardner was onboard, Sergeant Salas asked the passengers to get out their bus tickets, and he and Deputy Gardner proceeded to inspect tickets until Sergeant Salas located Tubens, who had been on the bus the entire time. When Sergeant Salas asked Tubens why he had not responded earlier, Tubens claimed that he had not heard his name being called. Sergeant Salas asked Tubens to exit the bus with the officers, and Tubens obliged.

Once outside, Tubens consented to a search of the suspect suitcase, which he confirmed belonged to him. While Deputy Gardner was searching the suitcase, Sergeant Salas asked Tubens if he had any carry-on luggage, testifying later that his experience had taught him that drug traffickers often attempt to avoid detection by moving their stash between their checked and carry-on luggage. Tubens asserted that he did not have any additional items, but with Tubens' earlier evasiveness fresh in his mind, Sergeant Salas refused to take Tubens' word for it and boarded the bus for further investigation. Returning to the area where he had found Tubens, Sergeant Salas discovered a square case and a paper sack on the luggage rack directly above Tubens' seat. As he went to

4

remove the items, the passenger occupying the seat immediately in front of Tubens' seat informed Sergeant Salas that she had earlier witnessed Tubens attempting to push something else down the luggage rack and out of his immediate proximity. Suspecting that he had not yet located all of Tubens' carry-on luggage, Sergeant Salas asked the passengers remaining on the bus to place all of their belongings on their laps so he could more easily identify who owned what. While the passengers were complying with that request, Sergeant Salas exited the bus and asked Tubens if either the paper sack or the canvas case belonged to him. Although Tubens had initially denied having any carry-on luggage, he admitted that both items were indeed his and consented to their search. Neither the paper sack nor the canvas case (which turned out to be a CD case) contained any contraband. At that point, Deputy Gardner informed Sergeant Salas that his search of Tubens' checked-suitcase had proved similarly unfruitful.

Following up on his earlier request, Sergeant Salas then reboarded the bus to see if any unclaimed items remained in the overhead luggage rack. Sure enough, upon reboarding, he immediately noticed a black bag close to where Tubens had been sitting. Sergeant Salas held up the bag so all of the passengers could see it and asked if it belonged to anyone on the bus. When no one claimed it, Sergeant Salas took it off the bus and asked Tubens if it belonged to him. Tubens asserted unequivocally that the bag was not his. After explaining that the bag had been legally abandoned because no one had claimed it, Sergeant Salas asked the bus driver for his consent to search the bag. The bus driver replied that, as long as no one was claiming it, the officers were free to search

5

it. A subsequent search of the bag yielded two cylinder-shaped packages containing methamphetamine and two prescription pill bottles with Tubens' name on them, and Tubens was arrested. Although Tubens was arrested approximately one hour after the bus made its scheduled stop, only twenty minutes or so passed between the time of Tubens' identification and his arrest.

## II. DISCUSSION

Finding that Tubens had "express[ly] and unequivocal[ly] disclaime[d]" ownership in the suspect carry-on bag, the district court denied Tubens' motion to suppress the evidence recovered therefrom on the ground that he had voluntarily abandoned the bag during a lawful detention based on reasonable suspicion. Vol. 1 at 65. In so holding, the district court rejected Tubens' assertion that the detention became tainted after a search of his checked luggage revealed no contraband: according to the court, "despite the fact that no drugs were found in [that] suitcase, other circumstances," including Tubens' failure to identify himself and his inconsistent answers about his carry-on luggage, "maintained, even heightened, Sergeant Salas's reasonable suspicion." Id. at 63.

Viewing the evidence in the light most favorable to the government and accepting the district court's findings of fact unless clearly erroneous, see United States v. Polly, 630 F.3d 991, 996 (10th Cir. 2011), our de novo review compels us to agree. For the reasons developed below, therefore, we affirm the district court's denial of Tubens' motion to suppress.

6

**a. The suspect carry-on bag was discovered during a lawful investigation**

Tubens contends his abandoning the carry-on was not voluntary, and thus that suppression is required, because his disclaimer of ownership was precipitated by a violation of his Fourth Amendment rights. Although he separately challenges as unconstitutional most of the component parts of the officers' investigation, the unifying theme throughout his brief is that the officers lacked the legal justification necessary to investigate as they did. We disagree: even assuming, as the district court did, that the officers' investigation of Tubens escalated from a consensual encounter, requiring no justification, to an investigative detention, requiring reasonable suspicion of criminal activity, see United States v. White, 584 F.3d 935, 945-46 (10th Cir. 2009), that standard was more than satisfied under the circumstances of this case, where two drug dogs independently alerted to Tubens' checked suitcase, and he responded to the officers' subsequent investigation in an evasive and inconsistent manner. Under the strictures of Terry v. Ohio, 392 U.S. 1 (1968), in other words, no Fourth Amendment violation precipitated Tubens' abandonment of the suspect carry-on because the officers' investigation was both "'justified at its inception'" and "'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Fonseca, 744 F.3d 674, 680 (10th Cir. 2014) (quoting Terry, 392 U.S. at 20).

Despite Tubens' protestations to the contrary, there can be no question that his detention was justified at its inception. No justification was needed to run the dogs through the bus's luggage compartment, see, e.g., United States v. Ludwig, 10 F.3d 1523,

7

1527 (10th Cir. 1993) ("[S]uch random and suspicionless dog sniffs are not searches subject to the Fourth Amendment."), and the positive alerts from Niko and Duke more than justified the officers in removing the suitcase, locating its owner, and detaining him for further investigation. See United States v. Williams, 726 F.2d 661, 663 (10th Cir. 1984) ("[A] drug sniffing dog's detection of contraband in luggage itself establish[es] probable cause, enough for the arrest, more than enough for the stop." (emphasis added, internal quotation marks omitted)); accord United States v. Lopez, 518 F.3d 790, 799 (10th Cir. 2008) ("[T]he level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause."). After all, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage." Florida v. Bostick, 501 U.S. 429, 434-35 (1991) (emphasis added). Tubens asserts otherwise, making much of the fact that the dogs "alerted" but did not give a final "indication" to his checked bag—though he himself interposes the two terms throughout his brief. See, e.g., Aplt. B. at 18. As this court recognized in United States v. Parada, however, although there are indeed factual differences between the two signals, those differences are irrelevant to the Fourth Amendment analysis, and a positive alert alone has long been sufficient to imbue officers with the probable cause necessary to justify an immediate search, or even an arrest. 577 F.3d 1275, 1282 (10th Cir. 2009). Armed with probable cause that Tubens was transporting drugs, therefore, the officers in this case thus

8

reasonably exercised the lesser-included powers of boarding the bus, forcing Tubens to identify himself, and asking him to exit the bus for questioning.

Although Tubens attempts to use this heightened level of suspicion against the officers, by asserting that they were required to search his bag before they boarded the bus for further investigation—apparently on the implicit, and probably incorrect, assumption that an unfruitful search at that point would have required the officers to terminate the encounter—it is beyond dispute that the Fourth Amendment does not so micromanage the on-the-spot decisions of experienced law enforcement officers.  The Supreme Court made as much explicit twenty-five years ago in United States v. Sokolow when it held that "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."  490 U.S. 1, 11 (1989).  Needless to say, an officer likewise does not act unreasonably when he foregoes more intrusive, albeit justified, actions and chooses instead to proceed more cautiously.

Nor is there any doubt that the officers' subsequent actions were "'reasonably related in scope to the circumstances which justified the interference in the first place.'"  Fonseca, 744 F.3d at 680 (quoting Terry, 392 U.S. at 20).  Although Tubens was initially detained on suspicions that he was trafficking drugs in his checked baggage, "common sense and ordinary human experience," id. (internal quotation marks omitted), strongly suggested that he was probably carrying additional luggage or personal items with him on the bus as well—he was, after all, on a cross-country bus trip to Philadelphia.  While Tubens maintained that he was traveling without any carry-on luggage, Sergeant Salas

9

acted reasonably in boarding the bus and seeing for himself: not only had Tubens just exhibited his propensity to be less than completely forthcoming, but Sergeant Salas' training and experience also instructed that drug traffickers often move their stash between their checked and carry-on bags in an effort to avoid detection. See, e.g., United States v. Arvizu, 534 U.S. 266, 273 (2002) ("[O]fficers [must be allowed] to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might elude an untrained person.'"). And once Sergeant Salas discovered the paper sack and CD case above Tubens' seat, and was further informed that Tubens had been seen pushing something else down the luggage rack, it was eminently reasonable for Sergeant Salas to ask the passengers remaining on the bus to place of all of their personal belongings on their laps so he could identify who owned what.

Finally, even though Sergeant Salas subsequently exited the bus and learned that no contraband was contained in Tubens' paper sack, CD case, or checked bag, he acted reasonably in reboarding the bus one last time to ensure that all of Tubens' personal belonging had been recovered. In asserting that the negative searches should have dispelled the officers' suspicions of drug trafficking, Tubens completely ignores the intervening events just documented. By the time the searches had proved unfruitful, for example, Tubens had failed to come forward when requested, had lied about having personal items on the bus, and had been accused by another passenger of attempting to conceal his carry-on luggage. See United States v. Wood, 106 F.3d 942, 947 (10th Cir.

1997) ("[I]nconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity"). Inferring from the totality of the circumstances that Tubens likely had another bag on the bus, Sergeant Salas was thus justified in reboarding the bus and continuing his investigation. Not only was it a logical follow-up on the request that he had just made to the other passengers, but it also did not significantly extend the duration of the detention. Indeed, there was nothing unreasonable about the duration of Tubens' detention more generally: although Tubens contends it lasted almost an hour, the district court found that only twenty minutes or so passed from when Tubens was located to when he was arrested. See United States v. Sharpe, 470 U.S. 675, 688 (1985) ("We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains.").

### b. Tubens voluntarily abandoned the suspect carry-on bag and thus lacks standing to challenge its search

In light of the fact that Tubens expressly stated that the suspect carry-on bag was not his, the district court did not clearly err in finding that Tubens had voluntarily abandoned the bag. See United States v. Denny, 441 F.3d 1220, 1228 (10th Cir. 2006). Although Tubens was under investigation when he disclaimed his ownership interest in the bag, the foregoing analysis makes clear that no Fourth Amendment violation precipitated that abandonment, and it is well-settled that "police pursuit or investigation at the time of abandonment of property, without more, does not of itself render abandonment involuntary." United States v. Hernandez, 7 F.3d 944, 947 (10th Cir.

11

1993).  Having voluntarily abandoned the bag in which the methamphetamine was found, therefore, Tubens lacks standing to challenge its subsequent search, and we thus affirm the district court's denial of his motion to suppress.  See id. ("A warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment.").

AFFIRMED.