**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

      No. 04-5118

RADAMES DE JESUS OJEDA-
RAMOS,

      Defendant - Appellant.

---

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 03-CR-148-EA)**

---

Kevin C. Danielson, Assistant United States Attorney, (David E. O'Meilia, United States Attorney, and Neal B. Kirkpatrick, Assistant United States Attorney, with him on the briefs), Tulsa, Oklahoma, for Plaintiff-Appellee.

Robert Ridenour, Assistant Federal Public Defender (Paul D. Brunton, Public Defender, and Barry L. Derryberry, Research & Writing Specialist, with him on the briefs), Tulsa, Oklahoma, for Defendant-Appellant.

---

Before **TACHA**, Chief Circuit Judge, **ANDERSON** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

During a routine screening of luggage in a bus stop, a drug dog alerted to a blue suitcase. The police used a ruse to cause Radames De Jesus Ojeda Ramos (Ojeda-Ramos) to claim the suitcase. He moved to suppress incriminating information and now appeals from the district court's denial of his motion. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

On September 17, 2003, Ojeda-Ramos, a Panamanian national, was traveling by Greyhound bus from Calexico, California, to Newark, New Jersey. During a scheduled stop in Tulsa, Oklahoma, all twenty-five passengers, including Ojeda-Ramos, left the bus.[1] Thereafter, Tulsa Police Officer Pat Dunlap had a canine sniff the cargo bays.[2] The dog alerted to a blue suitcase, which was locked and bore a tag containing the name "Ojeda-Ramos R." and a telephone number. (R. Vol. IV at 38.)

Typically, passengers re-board the bus fifteen minutes prior to departure. In this case, however, Officer Dunlap directed the bus driver to recall the passengers ten minutes earlier,[3] i.e., twenty-five minutes prior to departure, in

---

[1] Although the bus was scheduled to arrive in Tulsa at 11:50 A.M., it was ten minutes late. The stop was scheduled to last approximately an hour and a half. During such stops, the bus driver requires the passengers to leave the bus.

[2] Dunlap averaged three to five drug investigations per week at the Tulsa Greyhound bus station. Greyhound management condoned and assisted police officers in their drug interdiction efforts.

[3] The bus departed on schedule.

order to attempt to determine which passenger was connected to the blue suitcase.[4]  After the passengers re-boarded the bus, Officer Dunlap, posing as a Greyhound employee wearing a Greyhound shirt and hat, informed them the bus had mechanical problems.  He directed the passengers to leave the bus, claim their luggage and await the arrival of another bus.  Dunlap then began removing luggage from the cargo bays.  While doing so, he observed Ojeda-Ramos walk up to the blue suitcase, look down at it, stand it on end, and examine its tag.[5]

Officer Dunlap approached Ojeda-Ramos, identified himself as a police officer and received Ojeda-Ramos's permission to speak with him.  Dunlap asked Ojeda-Ramos for his bus ticket; the name on the ticket matched the name on the blue suitcase's tag.  He then requested identification.  Ojeda-Ramos provided Dunlap with his passport and United States visa.  Next, Dunlap asked Ojeda-Ramos why a drug dog had alerted to his suitcase.  Ojeda-Ramos responded, "I don't speak English." (R. Vol. IV at 58.)  Dunlap asked Ojeda-Ramos if the bag belonged to him.  Ojeda-Ramos replied in English, "That's not my bag." (*Id.*)

---

[4] Greyhound does not have passenger manifests.  Therefore, Officer Dunlap could not simply look at a list of passengers and their seat assignments to determine who owned the suitcase.

[5] In its order denying Ojeda-Ramos's motion to suppress, the district court stated Ojeda-Ramos also moved the suitcase approximately one foot to his left and stood by it.  It appears this fact came from the government's response to Ojeda-Ramos's motion to suppress, which contained no record citations.  Because the testimony at the motion to suppress hearing does not support this finding, we disregard it.

Finally, Dunlap asked Ojeda-Ramos to accompany him to the parcel storage area of the bus station. Ojeda-Ramos agreed, picked up the suitcase and followed Dunlap into the parcel storage room.[6] The other passengers re-boarded the bus, which departed on time.

In the parcel storage room, Dunlap asked Ojeda-Ramos if he could search the suitcase. Ojeda-Ramos again replied in English, "That's not my bag." (*Id.* at 61.) Considering the suitcase abandoned, another officer broke the lock on the suitcase, searched it and discovered approximately twelve pounds of heroin. Ojeda-Ramos was arrested and read his *Miranda*[7] rights in English. He remained silent. Later, after he requested an interpreter and was read his *Miranda* rights in Spanish, Ojeda-Ramos confessed to Drug Enforcement Administration (DEA) officers.

On October 10, 2003, Ojeda-Ramos was indicted for possession with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(I). He filed a motion to suppress all evidence against him, arguing it

---

[6] There is some discrepancy between the affidavit of the officer who completed the criminal complaint and Officer Dunlap's testimony and report concerning whether Ojeda-Ramos carried the suitcase to the parcel storage area on his own volition or pursuant to Dunlap's request. Since this factual finding is relevant to our discussion of whether Ojeda-Ramos abandoned the suitcase, we will assume (for this appeal) he voluntarily carried the suitcase to the parcel storage room. That assumption accords with Ojeda-Ramos's argument that his actions were inconsistent with abandonment. The favorable assumption does not save him.

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

was obtained in violation of the Fourth Amendment. After a hearing the district court denied the motion. It concluded: (1) the passengers were not seized under the Fourth Amendment when Officer Dunlap ordered them to leave the bus and claim their luggage; (2) Officer Dunlap's order for the passengers to leave the bus, made while posing as a Greyhound employee, was not illegal; (3) Officer Dunlap had probable cause to seize Ojeda-Ramos and bring him to the parcel room; and (4) the warrantless search of the blue suitcase was valid because Ojeda-Ramos voluntarily abandoned it. Subsequently, Ojeda-Ramos pled guilty, reserving the right to appeal from the denial of his motion to suppress. He was sentenced to eighty-seven months imprisonment.

## II. Standard of Review

In reviewing the denial of a motion to suppress, we accept factual findings unless they are clearly erroneous and view the evidence in the light most favorable to the ruling. *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). However, the ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewed *de novo*. *Id.*

## III. Discussion

Ojeda-Ramos contends the district court erred in denying his motion to suppress because (1) he was unlawfully seized when Officer Dunlap, disguised as a Greyhound employee, ordered him and the other passengers to leave the bus and claim their luggage, (2) the suitcase was not voluntarily abandoned, and (3) the

warrantless search of the suitcase was unlawful.  We address each argument in turn.

A. Seizure

The district court made two seizure determinations.  First, Officer Dunlap's order to leave the bus and claim luggage, made under the guise of being a Greyhound employee, was not a seizure.  Second, Ojeda-Ramos was seized when Officer Dunlap directed him to the parcel storage room, but the seizure was lawful.  At that time Officer Dunlap had individualized suspicion that the suitcase belonged to Ojeda-Ramos based on (1) his actions in response to Dunlap's ruse and (2) his bus ticket, which matched the name on the suitcase's tag.  *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."); *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.").

Ojeda-Ramos challenges only the district court's conclusion that Dunlap's order to leave the bus and claim luggage did not constitute a seizure.[8]  He

[8] It is undisputed that the drug dog's alert to the blue suitcase provided Officer Dunlap with probable cause to believe the suitcase contained illegal drugs.  *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) ("A canine alert provides the probable cause necessary for searches and seizures.").  Based on this belief, Officer Dunlap reasonably attempted to locate the individual connected to the suitcase.

Were we to conclude Officer Dunlap's order constituted an unlawful

concedes Dunlap neither advertised nor exploited his law enforcement powers when he made the order. Nevertheless, he argues the order would have caused a reasonable person to believe he was not free to ignore the request or terminate the encounter. Because the order was made under the guise of being a Greyhound employee, Ojeda-Ramos asserts the passengers would have felt compelled to comply in response to the directive of a bus company representative. We start by looking at ruse cases in general and then discuss this particular ruse.

In *United States v. Flynn*, law enforcement officers set up signs on a highway informing motorists they were approaching a drug checkpoint. 309 F.3d 736 (10th Cir. 2002). When the defendant observed the signs, he made an abrupt lane change and immediately took the nearest exit. At the top of the exit ramp, the defendant stopped his vehicle and his passenger dropped a package from the car. Officers hidden near the top of the exit ramp examined the package and discovered methamphetamine. Other officers pulled the defendant's vehicle over and arrested him. Flynn moved, unsuccessfully, to suppress the methamphetamine. On appeal, he argued the abandonment of the package was involuntary because it resulted from law enforcement's illegal conduct in operating a drug checkpoint. *Id*. at 738. We rejected the argument, concluding:

Up to [the moment the defendant's vehicle was stopped by the police],

___

seizure, then the validity of Ojeda-Ramos's subsequent detention would be called into question under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

[the defendant] acted voluntarily in response to a ruse established by the police (the signs warning of a fictitious checkpoint on I-40). The posting of signs to create a ruse does not constitute illegal police activity. . . . The officers put up the signs only as a ruse to observe suspicious behavior by those who might take the nearest exit after seeing the signs. . . . The creation of a ruse to cause the defendant to abandon an item is not illegal.

*Id.* at 738-39.

Similarly, in *United States v. Alejandro*, four police officers, wearing bulletproof vests and insignia identifying them as law enforcement officers, attempted to serve an arrest warrant on the defendant at his residence. 368 F.3d 130 (2d Cir. 2004). They knocked on the door for three to five minutes but no one answered. Eventually, one of the officers announced he was a gas company employee, there was a gas leak in the area and he needed to enter the apartment. Upon hearing this, Alejandro opened the door. The four officers, with weapons drawn, identified themselves as police officers and arrested him. After securing Alejandro, the officers conducted a sweep of his residence, which lead to the discovery of a suspicious "Igloo" cooler. The officers obtained a search warrant and seized the cooler which contained money and illicit drugs. Alejandro moved to suppress the evidence seized from his residence, arguing it was the fruit of the officers' entry into his residence in violation of the "knock and announce" rule contained in 18 U.S.C. § 3109. The district court denied the motion. On review the Second Circuit concluded the officers' ruse to gain entry to the residence violated neither § 3109 nor the Fourth Amendment. *Id.* at 137. *See also Lewis v.*

*United States*, 385 U.S. 206, 209 (1966) ("[I]n the detection of many types of crime, the Government is entitled to use decoys and conceal the identity of its agents."); *United States v. Michaud*, 268 F.3d 728, 733 (9th Cir. 2001) (officer's use of ruse to execute arrest warrant did not violate the Fourth Amendment).

In *United States v. Garzon*, (discussed in detail, *infra* at 15-18), the defendant was a passenger on a Greyhound bus traveling east from Los Angeles, California. 119 F.3d 1446 (10th Cir. 1997). On a layover in Denver, Colorado, an agent with the Drug Enforcement Agency (DEA) boarded the bus. The agent informed the passengers police were conducting drug interdiction activities at the terminal and a drug dog was waiting outside the bus. The agent then directed the passengers to remove all carry-on baggage and hold it in their right hand as they passed the dog. The agent knew dog sniffs of moving luggage are not particularly reliable, but that was not the point. His real purpose was to observe the passengers' reactions as they passed by the dog. *Id*. at 1448 n.1. When Garzon left the bus, he held his bag high on his left side, away from the dog. His behavior triggered police interest. When they later discovered two backpacks containing drugs left on the bus, they immediately suspected Garzon, who was arrested and convicted. Those backpacks were treated as abandoned property by the district court. We reversed, finding no abandonment.

In both *Flynn* and *Alejandro* the police misrepresented the facts—there was no drug check point in *Flynn* and the officers in *Alejandro* did not work for the

-9-

gas company—in order to observe or influence the defendants' actions. In *Flynn,* the police misrepresented the facts in order to observe motorist reaction to the misinformation. In *Alejandro,* the police went a bit further—requesting access to a home based on misinformation. This case is somewhat different (as is *Garzon*) because not only did Officer Dunlap wish to observe passenger reaction to misinformation but also required, or purported to require, an affirmative act of the passengers. That sets up our seizure analysis.[9]

Early cases suggested a person "has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)*; see also Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a

---

[9] Here, Dunlap had probable cause to believe the owner of the blue suitcase possessed contraband based on the drug dog's alert to the suitcase. *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) ("A canine alert provides the probable cause necessary for searches and seizures."). Ojeda-Ramos does not contend otherwise. Officer Dunlap also reasonably suspected that one or more passengers on the bus owned it. His testimony at the suppression hearing that ninety percent of the time, "if there's bag on the bus, there's going to be a passenger attached to it," eliminated other reasonable hypotheses. (R. Vol. IV at 37.) Based on this suspicion, he was justified in attempting to locate the owner. The question presented is whether the means used to locate the owner (posing as a Greyhound employee, informing the passengers the bus had mechanical problems and ordering the passengers to leave the bus and claim their luggage) passes Fourth Amendment muster, specifically, whether it was a seizure.

citizen may we conclude that a 'seizure' has occurred."). To that end we have considered several non-exclusive factors in determining whether an individual has been "seized," including: "1) the threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects . . . ; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed place; 8) and absence of other members of the public." *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005) (quotations omitted).

But *Mendenhall's* "free to leave" test is not exhaustive or universal. For instance, in *Florida v. Bostick*, the Court addressed a situation where the police boarded a bus and asked permission to search the defendant's luggage. 501 U.S. 429 (1991). The search revealed cocaine. The defendant claimed he was unlawfully seized because a reasonable person would not have believed he was free to leave given the fact he was on a crowded bus scheduled to depart. The Supreme Court rejected his argument, stating the defendant would not have felt free to leave even if the police had not been present. It concluded:

> [The defendant's] freedom of movement was restricted by a factor independent of police conduct--*i.e.*, by his being a passenger on a bus. Accordingly, the "free to leave" analysis on which [the defendant] relies is inapplicable. In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers'

requests or otherwise terminate the encounter.

*Id.* at 436; *see also United States v. Drayton*, 536 U.S. 194, 201 (2002) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.").

Under either of these tests, Dunlap's order to leave the bus and claim luggage was not a seizure and would not have been even if he had identified himself as a police officer. He wanted the passengers to comply,[10] but he did not demand, intimidate, threaten or use force against them. However compulsory Dunlap's order may have appeared, it would not have left an impression upon a reasonable person that he was not "free to leave." After all, Dunlap required the passengers to leave the bus, not remain on it. The passengers were not only free to leave, they could have ignored Dunlap's request to claim their luggage.[11] "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Drayton*, 536 U.S. at 205.[12] Ojeda-Ramos

---

[10] Dunlap candidly admitted he would have pressured any passenger who remained on the bus to follow his directive. That did not become necessary.

[11] According to Dunlap, if a passenger left the bus and walked away, a police officer would have stopped the individual and attempted to talk to him. Had that occurred, we would be looking at a significantly different case. *See Garzon* discussion, infra at 15-18.

[12] In *Drayton*, the defendants were traveling by Greyhound bus. The bus made a scheduled stop in Tallahassee, Florida, and the passengers disembarked. After the passengers had re-boarded the bus to continue their travels, the bus

acted voluntarily in associating himself with his luggage. When he left the bus he could have continued out of the area, even left the bus station.

Dunlap's disguise as a Greyhound employee is irrelevant. Conceding the ruse most likely influenced Ojeda-Ramos's actions does not change the calculus. Had Ojeda-Ramos known he was dealing with a police officer, he may not have approached the blue suitcase or may have left the bus terminal to avoid detection.

---

driver allowed three police officers to board the bus as part of a routine drug and weapons interdiction effort. Officer Hoover knelt on the driver's seat and faced the rear of the bus, allowing him to observe the passengers and ensure the safety of the other two officers without blocking the aisle or the exit. Officers Blackburn and Lang proceeded to the rear of the bus where Blackburn stationed himself, facing forward. Meanwhile, Lang, without blocking the aisle, worked his way toward the front of the bus, speaking with passengers concerning their travel plans and seeking to match them with the overhead luggage. The defendants were seated next to each other. When Lang approached, he identified himself as a police officer, his purpose for being there and asked if they had any bags on the bus. Both defendants pointed to a single bag. After obtaining their permission, Lang searched the bag, finding no contraband. Because the defendants were wearing heavy jackets (despite the warm weather) and baggy pants (which drug traffickers often use to conceal weapons and narcotics), Lang asked them if he could search their persons. Both defendants consented. Lang discovered drugs and arrested them.

Applying *Bostick*, the Supreme Court concluded the police officers did not seize the defendants when they boarded the bus and began questioning the passengers. 536 U.S. at 203. It considered the following factors dispositive: (1) the officers gave the passengers no reason to believe they were required to answer the officers' questions; (2) when Officer Lang approached the defendants, he did not brandish a weapon or make any intimidating movements and spoke in a polite, quiet voice; (3) Officer Lang left the aisle free so the defendants could exit; and (4) Officer Hoover did nothing to intimidate the passengers and said nothing to suggest they could not leave the bus. *Id.* at 203-05.

-13-

However, that is not the test.[13]  A ruse by law enforcement officers to influence behavior is not prohibited unless it is unconstitutional.  *See Flynn*, *supra* at 8; *Alejandro*, *supra* at 8-9; *Michaud*, *supra* at 9.  Because Dunlap's actions would not have been a seizure if he had identified himself as a police officer, the ruse did not violate Ojeda-Ramos' constitutional rights.  Speculation about whether he might have behaved differently absent the ruse does not inform the debate.

Ojeda-Ramos relies on *Garzon* to argue for a different conclusion.  To repeat, the agent's order in *Garzon* directed the passengers to collect their luggage and carry it in their right hand past a drug dog as they left the bus.  Although Garzon complied with their request to leave the bus, he ignored the request to carry his luggage in his right hand near the dog.  He carried a blue backpack high and on the left side, away from the dog.  His behavior did not go unnoticed.  Once all of the passengers left the bus, officers discovered two backpacks in the bus.  The officers made a limited inquiry as to their ownership, but no one claimed them.  The bags were then subjected to a canine sniff.  The sniff was unequivocal—the dog's aggressive alert, pawing at the bags, caused one of them to open, spilling its contents.  Officers then conducted a warrantless search of both bags, discovering cocaine.  Based on their observation of Garzon's behavior as he left the bus, he was targeted, eventually linked to the two bags and

---

[13] Had Alejandro known those seeking entry were police officers rather than gas company employees it is unlikely he would have opened the door.  *Alejandro*, *supra* at 8-9.

arrested.

Prior to trial Garzon moved to suppress the cocaine. The district court denied the motion, finding he objectively[14] abandoned his bags by disregarding the order to remove personal belongings from the bus. We disagreed. As a preliminary matter, we concluded the DEA agent's order for all passengers to leave the bus with their belongings in tow was not lawful.[15] *Id.* at 1450. Specifically, we noted the agent did not have a search or arrest warrant and "there is absolutely nothing in this record to suggest [the agent] had probable cause or even any articulable suspicion that [the defendant] or any other passenger on the bus was carrying drugs at the time the order was given." *Id.* Further, the order was directly contrary to the bus driver's previous instructions to the passengers that they could leave their personal belongings on the bus during the layover. *Id.*

Because, on the facts presented, the agent could not legitimately require the passengers to follow his directive, we concluded it was not unreasonable for the defendant to peacefully refuse to comply. *Id.* at 1450-51. And, because it was not unreasonable for the defendant to disregard the agent's request, his refusal

---

[14] The district judge found Garzon to have no subjective intent to abandon his drug laden backpacks, but by objective measure (failing to heed the removal order) he did abandon them.

[15] "We begin by emphasizing that the government did not argue, and the court did not find, that [the agent's] order for all passengers to disembark the bus with all their personal belongings and to proceed past a drug-sniffing dog was a lawful order." *Garzon,* 119 F.3d at 1450.

-15-

could not be deemed an abandonment of his property. *Id.* at 1451.

The issue in *Garzon* was narrow: "Is it so unreasonable to disregard an officer's unlawful order to remove personal belongings from a place where they are entitled to be kept for the purpose of facilitating a drug search that the act of refusal constitutes an objective abandonment of the property in question?" *Garzon*, 119 F.3d at 1450-51. Consequently, the focus was not on whether the DEA agent's request constituted a seizure, but rather on whether the defendant's failure to comply, without more, constituted an abandonment of his luggage.[16] We did not cite to either the *Mendenhall* or *Bostick* tests or apply any of the factors outlined in *Jones*. In fact, we did not even mention the word "seizure." Significantly, we did not conclude the request to collect baggage and leave the bus was a seizure — it could not have been since Garzon did not comply. Had he complied the court would have focused, as we do here, on whether that request was a seizure and if so, whether it was justified.[17]

_____

[16] That the defendant ignored the DEA agent's order to carry all of his luggage in his right hand past the drug dog counsels against a finding that the order constituted a seizure. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding a seizure does not occur by a show of authority unless the subject actually submits to such authority); *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002) ("Ultimately, a seizure requires either the use of physical force by the police officer or submission by the individual to the police officer's assertion of authority. A police officer's assertion of authority without submission by the individual does not constitute a seizure.") (citation omitted).

[17] Absent justification for doing so, treating the two bags Garzon left on the bus as abandoned might be construed as a seizure of those bags. If there was a seizure in *Garzon* that was it.

-16-

Garzon obviously felt free "to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436. Perhaps he was familiar with *Florida v. Royer*:

> The person approached [by the police], however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; *and his refusal to listen or answer does not, without more, furnish those grounds.*

460 U.S. 491, 497-98 (1983) (emphasis added) (citations omitted). Since Garzon declined the officer's request and was free to leave, there was no seizure of his person. Any seizure of the bags left on the bus (if it could be called a seizure) related only to abandonment.

Compliance with an official request (assuming freedom to ignore the request or terminate the encounter) is analytically different from a refusal to comply; blurring the distinction does not serve us well. Had Ojeda-Ramos made the choice to ignore the request to claim his luggage, *Garzon* would impact our seizure analysis as surely as it has our discussion of abandonment (*see infra* at 19-20). The district court correctly found Dunlap's order to leave the bus and claim luggage was not a seizure under the Fourth Amendment.[18]

B. Abandonment

---

[18] Given that Office Dunlap's order to leave the bus and claim luggage was not a seizure, we need not address Ojeda-Ramos's argument that the seizure was illegal because Dunlap lacked individualized suspicion that he, as opposed to one of the other twenty-four passengers, was connected to the bag.

Ojeda-Ramos acknowledges that abandoned property may be seized and searched without a warrant. However, he claims abandonment must be voluntary and is not if it results from a Fourth Amendment violation or an unlawful police order. He says he was unlawfully seized by Dunlap's order to leave the bus and claim luggage, thus his express disclaimers of interest in the suitcase were not voluntary. Possible Fourth Amendment violations aside, Ojeda-Ramos contends he did not voluntarily abandon the suitcase because he did not understand English, placing him at the mercy of the officers and unable to assert his rights. He further asserts his actions were inconsistent with abandonment. He never physically abandoned the suitcase and in fact, when Dunlap asked him to proceed to the parcel storage room, he brought the suitcase with him.[19]

"The test for abandonment is whether the defendant has retained any reasonable expectation of privacy in the property." *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). "Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." *Garzon*, 119 F.3d at 1449. The inquiry is one of intent and subsumes both a subjective and objective component. *Id.*; *see also Hernandez*, 7 F.3d at 947. A district court's findings of subjective intent are findings of fact reviewed for clear error. *Garzon*, 119 F.3d at 1149. Whether the defendant objectively abandoned his property (*i.e.*, whether he retained an

---

[19] *See supra* note 6.

objectively reasonable expectation of privacy in the property) is a question of law reviewed *de novo*. *Id.*

A defendant's abandonment of property must be voluntary. *Hernandez*, 7 F.3d at 947. It is not voluntary if it results from a violation of the Fourth Amendment. *Id.* "However, police pursuit or investigation at the time of abandonment of property . . . does not of itself render abandonment involuntary." *Id.*

When Dunlap asked Ojeda-Ramos whether the blue suitcase was his, he expressly disclaimed any interest it. Therefore, Ojeda-Ramos abandoned the blue suitcase. *See United States v. Denny*, 441 F.3d 1220, 1227-28 (10th Cir. 2006) (concluding an express disclaimer of ownership in response to a lawful police inquiry constitutes abandonment). That Ojeda-Ramos may have voluntarily carried the suitcase to the parcel storage room (*i.e.*, not pursuant to an order from Dunlap) does not affect this conclusion. After Ojeda-Ramos had carried the suitcase to the parcel storage room, he again expressly and unequivocally disclaimed any interest in it. Dunlap was entitled to take Ojeda-Ramos at his word.[20] *Id.* at 1228.

Ojeda-Ramos's abandonment of the suitcase was voluntary. As we concluded above, Ojeda-Ramos was not seized by Dunlap's order to leave the bus

---

[20] "By contrast, Garzon never verbally disclaimed an interest in his backpacks. . . ." *Garzon*, 119 F.3d at 1452.

and claim luggage. Moreover, as the district court correctly concluded and Ojeda-Ramos does not contest, Dunlap's seizure of Ojeda-Ramos when he asked Ojeda-Ramos to follow him to the parcel storage room was reasonable. Thus, his abandonment of the suitcase was not the result of a Fourth Amendment violation. Ojeda-Ramos's claim that any abandonment of the suitcase was rendered involuntary due to the fact he could not speak English, which in turn placed him at the mercy of the officers and unable to assert his rights, is unavailing because it is contradicted by the evidence. When Dunlap asked Ojeda-Ramos in English for his ticket and identification, Ojeda-Ramos responded by handing Dunlap his ticket and identification. Ojeda-Ramos answered several of Dunlap's questions in English. According to Dunlap, when Ojeda-Ramos responded to his questions in English, Dunlap was able to understand it. Indeed, Dunlap testified Ojeda-Ramos's responses were "perfectly clear." (R. Vol. IV at 64.)

C. Warrantless Search

Ojeda-Ramos claims the warrantless search of his suitcase violated the Fourth Amendment. He contends there were no exigent circumstances mandating an exception to the warrant requirement. He also argues that because the suitcase was locked, he had no access to it so as to invoke the search incident to arrest doctrine. Because Dunlap had possession of the bag, Ojeda-Ramos claims he could have obtained a routine warrant and his failure to do so is fatal.

We easily dispose of this argument. "A warrantless search and seizure of

abandoned property is not unreasonable under the Fourth Amendment."

*Hernandez*, 7 F.3d at 947.

AFFIRMED.