FILED
United States Court of Appeals
Tenth Circuit

June 15, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 08-2207 |
| | (D. N.M.) |
| JESUS GERARDO QUINTANA-GRIJALVA, | (D.Ct. No. 2:07-CR-02510-RB-1) |
| Defendant - Appellant. | |

_____

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **EBEL**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and the appellate record, this panel has

determined unanimously to honor the parties' request for a decision on the briefs

without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).

Therefore, this case is ordered submitted without oral argument.

Jesus Gerardo Quintana-Grijalva was apprehended in southern New

Mexico, approximately thirty miles from the international border, after fleeing

_____

[*] This order and judgment is not binding precedent. 10th Cir. R. 32.1(A). Citation to orders and judgments is not prohibited. Fed. R. App. 32.1. But it is discouraged, except when related to law of the case, issue preclusion or claim preclusion. Any citation to an order and judgment must be accompanied by an appropriate parenthetical notation -- (unpublished). 10th Cir. R. 32.1(A).

from his marijuana-laden truck on foot.  The district court denied his motion to suppress, concluding he lacked standing to challenge the seizure of marijuana from his vehicle because he voluntarily abandoned it.  Following the court's ruling, Quintana-Grijalva entered into a plea agreement with the government, reserving his right to appeal from the denial of his motion to suppress.  He now appeals; we affirm.

## I.  BACKGROUND

On September 22, 2007, a white Ford F-150 extended cab pickup truck crossed illegally into the United States by cutting through a fence, but escaped back to Mexico when approached by United States Border Patrol (USBP) agents. The following day, USBP agent Adrian Miranda[1] and an agent trainee were advised a portion of fence had been cut just north of the border near San Luis Pass, a vehicle intrusion had apparently occurred, and the agents should look out for the illegally-crossing vehicle.  They were also advised of the events the day before.  After receiving this information, Miranda and the agent trainee began their patrol in a white, unmarked Dodge Durango equipped with a canine in a kennel.

The agents traveled down Perimeter Road, which provides one of the few northerly routes bypassing Highway 81, the major highway running north from

---

[1] Miranda testified at the suppression hearing that during his approximately seven years as a USBP agent, he has served exclusively in the Lordsburg, New Mexico area and has been involved in approximately fifteen apprehensions in that area.

the Antelope Wells Port of Entry. Perimeter Road is a one-lane dirt road which sees "[v]ery minimal" traffic. (R. Vol. III at 37.) It is used primarily by a local rancher and rarely by non-locals. All of the roads in the area, including Perimeter Road, are notorious for smuggling.

In the early afternoon, Miranda spotted a white Ford F-150 extended cab pickup truck driving north toward him on Perimeter Road, approximately thirty miles from the international border. Miranda did not recognize the vehicle. He surmised the Ford most likely traveled north on Highway 81 before turning onto Perimeter Road. Miranda pulled over to allow the Ford to pass. Though it is customary for occupants of vehicles encountering each other in this area to speak with one another when they pass, the occupants of the Ford did not stop. Instead, they looked at Miranda and his colleague, turned away, then looked straight ahead. Neither the driver nor the passenger turned to see how close they were to the Dodge when they passed. Miranda noticed the driver and passenger appeared to be Mexican. He also noticed the Ford had an Arizona license plate with a fleet tag, which indicated it was a rental vehicle.[2] Miranda knew smugglers often utilize stolen and rental vehicles in order to avoid having their personal vehicles confiscated. While he testified he had encountered non-local traffic on Perimeter Road in the past, he could not recall encountering a rental vehicle with Arizona

---

[2] Miranda explained the license plate stated "F-L-T" which usually indicates the vehicle belongs to a fleet of rental vehicles. (R. Vol. III at 21.)

-3-

plates that was not involved in smuggling.

Miranda executed a U-turn and began following the Ford. For purposes of officer safety, he requested a registration check on the license plate. He also requested a 72-hour lane check to ascertain whether it had crossed the border via a port of entry during the previous 72 hours. The lane check indicated the Ford had not recently passed through a port of entry. While waiting on the registration check, Miranda continued to follow the Ford from approximately two or three car lengths behind. Miranda noticed the driver of the Ford looking out of his side mirror at Miranda and then turning to speak to the passenger. The Ford slowed almost to a stop, continued on, and then slowed down again. Miranda did not attempt to pass. After a couple of minutes, the registration check came back indicating the Ford was registered with a rental company in Phoenix, Arizona. Miranda knew Phoenix to be a common smuggling destination.

Miranda activated his emergency equipment in order to conduct an immigration inspection. The driver accelerated, the truck fish-tailed, and they turned around to head south. During the process, the Ford hit the berm next to Miranda's Dodge, became airborne, and almost hit the Dodge. As Miranda turned his vehicle around to follow, he notified his supervisor of the Ford's failure to yield and requested assistance. Another USBP agent advised Miranda he would deploy spikes to deflate the tires of the Ford. Miranda disengaged his emergency equipment, and the Ford slowed down. Miranda continued to follow the Ford

-4-

from a distance of approximately four or five car lengths.

Miranda followed the Ford for five to ten minutes before the Ford came upon the spikes. As the Ford approached the spikes, the driver attempted to veer off the road and through a fence. The berm prevented the Ford from hitting the fence and caused it to slide back down the berm at an angle. It ran over the spikes with its right rear tire, but continued east toward Highway 81. Another USBP vehicle was parked at the intersection of Highway 81. Approximately 50 to 100 yards from the intersection, the Ford left the road in a southerly direction toward Highway 81. Just south of the intersection, it drove through a barbed wire fence along Highway 81 and ended up on the pavement, approximately 100 yards away from Miranda's vehicle. It continued south on Highway 81 for approximately fifteen minutes. Miranda continued to follow from approximately five car lengths and witnessed both the driver and the passenger talking on a radio. Other USBP vehicles were also following the Ford at this point.

As the Ford attempted to enter San Luis Pass; it missed the entrance and went through the barbed wire fence just south of the location where the cut fence had been reported the previous day. It continued on for approximately 100 yards before the entangled barbed wire brought it to a stop. Miranda followed and observed the driver rocking the Ford in an attempt to free it from the barbed wire. As Miranda approached in his Dodge, the driver and the passenger jumped out of the Ford, left the doors to the cab open and ran in opposite directions.

Approximately fifty yards east of the Ford, Miranda apprehended the driver, who identified himself as Quintana-Grijalva. Miranda transferred custody of Quintana-Grijalva to other USBP agents who transported him, along with the passenger, to the Lordsburg Border Patrol Station for processing. Miranda returned to his Dodge, got his canine partner, and had the dog check the Ford. The dog alerted to the back of it. The USBP agents opened the extended cab portion of the Ford and observed bundles of a substance under a blanket that field-tested positive for marijuana. The USBP agents also discovered cell phones, a two-way radio, and a battery for the radio.

Quintana-Grijalva was indicted with conspiracy to possess with intent to distribute 100 kilograms and more of marijuana (Count One) and possession with intent to distribute 100 kilograms and more of marijuana and aiding and abetting the same (Count Two).[3] He filed a motion to suppress the marijuana discovered in the truck arguing the stop of his vehicle was not justified at its inception because it was not based upon reasonable suspicion.[4] The government argued Quintana-Grijalva lacked standing to challenge the seizure of the marijuana because he abandoned it when he fled from the truck. The government also

---

[3] The passenger of the vehicle, Oscar Almarez-Lopez, was indicted on these same charges. He pled guilty to Count Two pursuant to a plea agreement and was sentenced to 60 months imprisonment.

[4] Quintana-Grijalva stated he also sought to suppress the statements he made to the USBP agents after he was arrested as "fruit of the poisonous tree." (R. Vol. III at 36.) He offered no argument on this point and indicated to the district court at the hearing that he did not challenge the admissibility of any statements he made following his arrest.

argued the stop was supported by reasonable suspicion. The district court held a hearing at which Miranda testified to the facts recited above.

The court concluded Quintana-Grijalva did not have standing to challenge the seizure of the marijuana because he "abandoned the Ford and its contents when he jumped out, left the door open with the marijuana in the extended cab of the Ford, and fled from agents on foot." (R. Vol. I at 37.) It determined Quintana-Grijalva's flight from the Ford was voluntary because it did not result from a Fourth Amendment violation. It held, based on the totality of the circumstances, the agents had reasonable suspicion to believe the occupants of the Ford were involved in criminal activity.

Following the denial of his motion to suppress, Quintana-Grijalva entered into a plea agreement with the government pursuant to which he pled guilty to both counts of the indictment, but reserved his right to appeal the denial of his motion to suppress. The court sentenced Quintana-Grijalva to 60 months imprisonment on each count to run concurrently.

## II. DISCUSSION

Quintana-Grijalva contends he has standing to challenge the seizure of the marijuana because he did not abandon his vehicle and, if he did, the abandonment was not voluntary because it followed a Fourth Amendment violation.

A. Abandonment

"The Fourth Amendment protects people from unreasonable government

-7-

intrusions into their legitimate expectations of privacy. But a warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment . . . because when individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) (quotations and citations omitted). "The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997) (quotations and citations omitted). The burden is on the government to establish abandonment by a preponderance of the evidence. *See United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006). The inquiry is one of intent and subsumes both a subjective and objective component. *See Garzon*, 119 F.3d at 1449.

"Findings of subjective intent are findings of fact, which we review only under a clearly erroneous standard." *Id*. Here, the district court found "[Quintana-Grijalva] and the passenger intended to abandon the Ford and its contents when they fled on foot." (R. Vol. I at 36.) Quintana-Grijalva maintains "no evidence exists as to [his] actual intent at the time he ran from the Ford." (Appellant's Br. at 15.) He appears to discount the fact that his conduct—the flight from the truck—is clearly demonstrative of his subjective intent.

-8-

Moving on to the objective intent, "whether the defendant retained an objectively reasonable expectation of privacy in the property that society will recognize is a question of law that we review *de novo*." *Garzon*, 119 F.3d at 1449. Quintana-Grijalva argues under an objective test, the possessions he left in the Ford—cell phones, a two-way radio and a battery—indicate he intended to return to the vehicle. That is the extent of his argument. He does not cite legal authority to support his position. For that reason alone, we need not devote much time to his argument. *See Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1217 (10th Cir. 2008) (deeming argument waived for failure to cite supporting legal authority or record evidence); *MacArthur v. San Juan County*, 495 F.3d 1157, 1160-61 (10th Cir. 2007) ("[M]ere conclusory allegations with no citations to the record or any legal authority for support does not constitute adequate briefing.") (quotations omitted).

In any case, whether a defendant harbored a desire to later retrieve an object allegedly abandoned "is irrelevant to our analysis of the objective component." *Denny*, 441 F.3d at 1227. In *Denny*, we held the defendant had abandoned a clear plastic bag which contained cocaine when he removed it from a larger bag, placed it underneath his seat on a train, and disclaimed ownership of it. *Id.* at 1223. Although the defendant "undoubtedly intended to retrieve the bag once the agent was no longer on his trail," that fact alone "[did] not dispose of our inquiry." *Id.* at 1227. We explained: "Even where a suspect does not

subjectively intend to relinquish all ownership interest in an item, such suspect may nevertheless relinquish his or her reasonable expectation of privacy in the item." *Id.* Because the defendant did not retain a reasonable expectation of privacy in the clear plastic bag that society was willing to recognize, we reversed the district court's grant of the defendant's motion to suppress.

Similarly here, Quintana-Grijalva did not retain a reasonable expectation of privacy in the truck or any of its contents when he fled from the truck, leaving the doors open and the marijuana (and other objects) inside.

B.  Voluntariness

"An abandonment must be voluntary . . . ." *Austin*, 66 F.3d at 1118. Quintana-Grijalva claims if he did abandon the Ford and its contents, the abandonment was not voluntary because: (1) he was being pursued by law enforcement at the time of the abandonment; and (2) the abandonment resulted from an earlier Fourth Amendment violation. A "police pursuit or investigation at the time of abandonment of property does not of itself render abandonment involuntary." *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1187 (10th Cir. 2006) (quotations omitted). However, "[a] defendant's abandonment of property . . . is not voluntary if it results from a violation of the Fourth Amendment." *Id.* Thus, we consider only whether Quintana-Grijalva's abandonment resulted from an earlier Fourth Amendment violation. "The ultimate determination of reasonableness under the Fourth Amendment is . . . a conclusion of law that we

-10-

review de novo." *United States v. De La Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998) (quotations omitted). The evidence to support that conclusion, however, must be viewed in the light most favorable to the prevailing party, and we must accept the district court's findings of fact unless they are clearly erroneous. *See id.* at 1277-78.

An abandonment is involuntary only when preceded by a Fourth Amendment violation; the abandonment must "*result[] from*" the violation. *Ojeda-Ramos*, 455 F.3d at 1187 (emphasis added). In this instance, Quintana-Grijalva was not seized before he abandoned the Ford. For there to be a seizure, the suspect must submit to the officer's authority. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991) (holding defendant was not seized when he tossed crack cocaine from his person while engaged in a foot chase with the police because an officer's assertion of authority does not constitute a seizure unless the suspect actually submits to the authority); *United States v. Harris*, 313 F.3d 1228, 1235 (10th Cir. 2002) (holding police officer did not seize defendant when he began asking him for his identification because defendant "did not submit" to the officer's authority); *Latta v. Keryte*, 118 F.3d 693, 700 (10th Cir. 1997) (holding defendant not seized during unsuccessful pursuit on the interstate because it "did not cause [him] to submit to the authority or succeed in stopping him"); *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994) (holding plaintiff was not seized when an officer fired three rounds at the helicopter he was piloting because

the shots "did not cause [the plaintiff] to submit nor did they otherwise succeed in stopping him") (footnote omitted).  Whether Miranda reasonably suspected criminal activity when he activated his emergency equipment is irrelevant to the Fourth Amendment analysis because Quintana-Grijalva did not submit to Miranda's authority.  As the district court correctly held, Quintana-Grijalva was not seized until he was apprehended after abandoning the Ford.  Because Quintana-Grijalva's Fourth Amendment rights were not implicated prior to the seizure, Quintana-Grijalva's abandonment could not have "result[ed] from" a Fourth Amendment violation.  *See Ojeda-Ramos*, 455 F.3d at 1187.

For the sake of completeness, we consider the district court's determination that Miranda had a reasonable suspicion of criminal activity when he activated his emergency equipment.  When a border patrol agent conducts a roving border patrol stop, he must have "reasonable suspicion that criminal activity may be afoot." *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.  Border patrol agents may thus stop vehicles if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion of criminal activity." *Id.* (quotations and citations omitted).

-12-

The following factors are relevant in determining whether an immigration stop is supported by reasonable suspicion: (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded. A law enforcement officer may assess these factors in light of his experience and specialized training and a court should accord deference to an officer's ability to distinguish between innocent and suspicious actions. Guided by these factors, the ultimate assessment of reasonable suspicion depends on the totality of the circumstances. In making that determination, a court may not evaluate and reject each factor in isolation.

*Id.* at 1129-30 (citations omitted).

The district court concluded "[a] review of the totality of the circumstances establishes that Agent Miranda had reasonable suspicion to stop the Ford and detain [Quintana-Grijalva]." (R. Vol. I at 41.) It explained:

Agent Miranda encountered the Ford on a one-lane dirt road in a sparsely populated area, located approximately thirty miles from the international border. The Ford was traveling away from the border area. Agent Miranda noticed the Arizona license plate and the fleet tag, which indicated the Ford was a rental. Based on his previous experience with alien traffic, Agent Miranda knew that smugglers often utilize stolen and rental vehicles in order to avoid having their personal vehicles confiscated. The registration check confirmed that the Ford was registered to a rental company in Phoenix, Arizona.

Agent Miranda was familiar with local residents and patterns of traffic. Agent Miranda knew that, only very rarely, did non-residents use this very remote road. Agent Miranda recognized neither the Ford nor its occupants. Although locals customarily stopped to speak with passing vehicles on Perimeter Road, the Ford did not stop. In fact, neither the driver nor the passenger turned to see how

-13-

close they were to the Dodge when they passed by. Agent Miranda had been advised that a vehicle matching the description of the Ford had illegally entered the United States from Mexico. The occupants of the Ford exhibited suspicious behavior. The driver and the passenger of the Ford looked at the USBP agents, turned away, and looked straight ahead. As Agent Miranda followed the Ford, the driver watched Agent Miranda in the side mirror of the Ford. The driver turned and talked to the passenger, and slowed almost to a stop and started moving again.

(*Id.*)

Quintana-Grijalva challenges various factual findings of the district court and the significance the court placed on those findings. While we will discuss each of Quintana-Grijalva's concerns, we are cognizant of the Supreme Court's instruction in *United States v. Arvizu* that Courts of Appeal should consider the various factors as a whole and should not engage in a "divide-and-conquer analysis." 534 U.S. 266, 274 (2002). The *Arvizu* Court made clear "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id.* at 277. With this in mind, we consider Quintana-Grijalva's challenges.

First, Quintana-Grijalva claims Miranda "had no reason to believe that the Ford he saw came from the border that day." (Appellant's Br. at 10.) He points out Miranda encountered the Ford more than 30 miles from the border. Quintana-Grijalva relies on *United States v. Lopez*, wherein the Fifth Circuit concluded border patrol agents did not have reasonable grounds to believe the defendant came from the border when he was first observed "some 55 miles from the

-14-

border" and several small towns were situated between the border and the location at which he was observed. 564 F.2d 710, 712 (5th Cir. 1977). The present case is clearly distinguishable and other cases are more apt. *See United States v. Quintana-Garcia*, 343 F.3d 1266, 1272 (10th Cir. 2003) (the fact defendant's vehicle was stopped "50-60 miles from the U.S.-Mexico border" was a "legitimate consideration[ ] for [the border patrol agent] when making his reasonable suspicion calculus"); *see also United States v. Neufeld-Neufeld*, 338 F.3d 374, 381 (5th Cir. 2003) (affirming denial of motion to suppress and finding it "noteworthy that . . . [the defendant] was thirty-five miles from the border" at the time he was stopped).

Second, Quintana-Grijalva challenges the significance of the 72-hour lane check, which indicated the Ford had not crossed the border via a port of entry during the 72 hours preceding the check. He points to cases in which the government has argued a stop is justified by a recent border crossing and argues: "To find that a lack of recent border crossings is equally suspicious puts the agent in a 'heads I win, tails you lose' position." (Appellant's Br. at 21 (quoting *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1447 (9th Cir. 1994).) The significance of a recent border crossing, like any fact in the reasonable suspicion analysis, depends on its context. *See, e.g., Gandara-Salinas*, 327 F.3d at 1131 (holding the totality of the circumstances, including the fact defendant's vehicle had crossed the border the previous day, "supports a finding of reasonable suspicion of

-15-

criminal activity justifying the stop"); *Quintana-Garcia*, 343 F.3d at 1272 (where check of defendant's vehicle revealed it had crossed the border approximately two to three hours before being stopped by border patrol agent, holding "the brief amount of time the vehicle had been in the country [was a] legitimate consideration[ ] for [the agent] when making his reasonable suspicion analysis"). Quintana-Grijalva's argument fails to account for the fact that here, Miranda was specifically on the look-out for a vehicle—very possibly a white Ford F-150 extended cab pickup truck—that had crossed illegally into the United States by cutting through a fence. If the Ford had crossed illegally, it would not show up on a 72-hour lane check. Thus, the fact the 72-hour lane check on Quintana-Grijalva's vehicle was negative should have increased, rather than decreased, Miranda's suspicion.

Third, Quintana-Grijalva contends Miranda (and the district court) placed too much weight on the characteristics of the particular vehicle —specifically, that it was a white Ford F-150 extended cab pickup truck. He argues: "The fact that the agents may have learned that another F-150 in the area may have been involved in transporting contraband does not add to the reasonable suspicion calculus concerning this vehicle." (Appellant's Br. at 23.) He contends there were many Ford vehicles in the area and "[t]he fact that an F-150 is a common vehicle that may lend itself to transporting cargo cannot, without significantly more, provide reasonable suspicion for an investigative stop." (*Id*. at 22.)

-16-

Quintana-Grijalva's argument misses the mark. What was important here was not simply that Quintana-Grijalva was driving a Ford F-150 extended cab pickup truck; rather, the importance lay in the fact he was driving a vehicle in an extremely remote area which precisely matched the description of the vehicle observed crossing illegally into the United States the previous day. Surely, the fact Miranda observed a vehicle exactly matching the description of the vehicle for which he was looking is an appropriate factor to consider in the reasonable suspicion analysis, especially since the area was rarely traveled.

Quintana-Grijalva also challenges the consideration given to the facts his vehicle had Arizona license plates, it was registered to a rental agency in Phoenix, his erratic driving, and his demeanor. Again, we afford the presence of out-of-state license plates differing weight depending on the facts of the case. *Compare United States v. Martinez-Cigarroa*, 44 F.3d 908, 911 (10th Cir. 1995) (concluding border patrol agent's observation of green out-of-state license plates resembling Colorado plates on a car he did not recognize as a local vehicle did not "contribute measurably to the [reasonable suspicion] analysis"); and *United States v. Monsisvais*, 907 F.2d 987, 991 (10th Cir. 1990) ("[T]he record does not enable us to attach any particular significance to the appearance of Arizona license plates in this area.") *with United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992) (concluding investigative stop of vehicle was proper where, *inter alia*, "the vehicle had out-of-state, Texas license plates"); and *United States v.*

*Leyba*, 627 F.2d 1059, 1064 (10th Cir. 1980) (holding the fact "the vehicle bore out-of-state plates" is "entitled to some limited consideration because [the border patrol agent] did not recognize the vehicle as local traffic from the area").

Here, the Arizona license plates contributed to Miranda's reasonable suspicion. We must view the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Leyba*, 627 F.2d at 1063 (quotations omitted). Miranda testified that in his approximately seven years as a USBP agent in the Lordsburg, New Mexico area, he could not recall ever encountering a vehicle with Arizona plates on Perimeter Road that was not involved in smuggling. In his experience, smugglers often used rental vehicles and Phoenix was a common smuggling destination. We see no error in the weight Miranda (and the district court) afforded to these facts.

Quintana-Grijalva contends "any erratic driving was caused by the agents' following within a few car-lengths of the Ford on a remote highway" and "[h]is behavior was consistent with an attempt to allow a closely following car to pass." (Appellant's Br. at 24.) We have held cautious driving "cannot standing alone support a reasonable suspicion of illegal activity." *United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993). But here, Miranda observed more than slow driving. The occupants of the Ford did not stop to speak to the border patrol agents when they passed the Dodge and did not check to see how close they were to the Dodge when they passed by. They then looked at the agents, turned away

-18-

and looked straight ahead. As Miranda began following them, he noticed Quintana-Grijalva looking at Miranda out of his side mirror and turning to talk to the passenger. While these facts alone would not support a finding of reasonable suspicion, our review must be "guided by the principle that the circumstances surrounding a stop are not to be dissected and viewed singly; rather, they must be considered as a whole . . . . Each case must turn on the totality of the particular circumstances." *Leyba*, 627 F.2d at 1063 (quotations omitted); *see also Arvizu*, 534 U.S. at 274. Viewing the totality of the circumstances, we have no trouble concluding Miranda had reasonable suspicion of criminal activity sufficient to justify his attempted stop of Quintana-Grijalva's vehicle.

Quintana-Grijalva abandoned the Ford and its contents before he was seized. Therefore, his abandonment was voluntary. In any event, Miranda had reasonable suspicion of criminal activity at the time he attempted to stop the Ford for further investigation. As a result, Quintana-Grijalva lacks standing to challenge the seizure of marijuana.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

-19-